**STANDARD INSURANCE COMPANY, Plaintiff,**

v.

**John MORRISON, State Auditor, ex officio Commissioner of Insurance, Defendants.**

**No. CV 06-47-H-DWM.**

United States District Court,
D. Montana,
Helena Division.

Feb. 27, 2008.

Jacqueline T. Lenmark, Helena, MT, Lara Kollios, Shawn Hanson, Katherine Ritchey, Jones Day, San Francisco, CA, for Plaintiff.

James G. Hunt, Helena, MT, for Amicus AARP.

Mary Ellen Signorille, Washington, DC, Lawrence A. Anderson, Great Falls, MT, for Defendant.

## OPINION AND ORDER

DONALD W. MOLLOY, District Judge.

Plaintiff Standard Insurance Company ("Standard") issues and administers employee benefit plans for employers, and sells group disability and disability income insurance. It does business in the State

of Montana. John Morrison ("Morrison") is the Insurance Commissioner for the State of Montana. He is an elected official charged with regulating the insurance industry on behalf of the citizens of Montana. In this case, Standard sued Morrison challenging his disapproval of any employee benefit plan that contains a "discretionary clause." The dispute here stems from Standard's claim that Morrison's action is preempted by a federal law—the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101, et seq.—and therefore it violates the Supremacy Clause of the Constitution.[1] On the other hand, Morrison claims that state law mandates the disapproval of discretionary clauses, that ERISA's own terms save from preemption the policy of disapproving such clauses, and therefore the state policy does not violate the Supremacy Clause.

The parties have filed cross-motions for summary judgment. The issues are fully briefed and the Court heard oral argument on December 14, 2007. For the reasons set forth below, Morrison's action does not violate the Supremacy Clause of the Constitution.

## I.

Morrison has implemented a state-wide practice he argues is required by a state statute, Mont.Code Ann. § 33–1–502. The policy implemented disapproves of employee retirement benefit plans that contain a discretionary clause. A discretionary clause invokes a plan provision that grants the plan administrator (who is often, as here, the insurance company that issues the plan) authority to interpret the plan and to resolve all questions arising under it, such as whether a plan beneficiary is entitled to benefits. Discretionary clauses

vest extraordinary power in the plan administrator to resolve disagreements with a plan participant. These types of clauses matter, among other reasons, because judicial review of an administrative decision in the ERISA context is governed by the abuse of discretion standard of review when a plan contains a discretionary clause. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If there is no discretionary clause in the plan, the *de novo* standard of review applies. *Id.* A discretionary clause means a more deferential standard of judicial review when an administrator's decision to deny benefits is challenged on appeal in district court.

The state statute that Morrison claims gives him the power to disapprove discretionary clauses provides that the State Insurance Commissioner "shall disapprove any [insurance] form ... [that] contains or incorporates by reference, where such incorporation is otherwise permissible, any inconsistent, ambiguous, or misleading clauses or exceptions and conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract." Standard disagrees, and argues that federal ERISA laws preempt any state law that "relate[s] to any employee benefit plan" ERISA covers. *See* 29 U.S.C. § 1144(a). Morrison counters this assertion by arguing that his disapproval of discretionary clauses is saved from preemption by ERISA's Savings Clause. That clause in the federal law expressly saves from preemption any state law that "regulates insurance, banking or securities." 29 U.S.C. § 1144(b)(2)(A).

At oral argument, the parties discussed three issues implicit in this controversy: 1) the constitutionality of the statute Morri-

---

**1.** *See* U.S. Const. art. VI ("The Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

son claims grants him the authority to disapprove discretionary clauses; 2) the constitutionality of Morrison's disapproval of discretionary clauses; and 3) whether the state statute actually grants Morrison the authority to implement the practice.

The first issue is not before me. Standard does not challenge the Montana Legislature's *grant* of authority to the Insurance Commissioner, but does contest Morrison's particular *exercise* of this authority. Standard's challenge is to the Insurance Commissioner's practice. It does not question the legislature's decision to grant the Insurance Commissioner power to regulate the insurance industry, nor does it question the scope of this power as the legislature has defined it.

Counsel for Standard acknowledged, in response to a question during oral argument, that the third issue is a question of state law. If the question here was whether discretionary clauses are "inconsistent, ambiguous, or misleading clauses or exceptions and conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract," the resolution would require interpretation of the state statute to determine whether Morrison is acting outside the scope of the authority the legislature granted him. The responsibility for resolving this issue would lie with the courts of the State of Montana.

The issue here is the constitutionality of Morrison's practice of disapproving discretionary clauses. It is crucial to resolving this issue to keep the principle of American federalism in view. The Supremacy Clause of the United States Constitution reveals that where federal law and state law conflict, federal law preempts state law. Keeping in mind the principle of federalism, the question here is how Morrison's action is affected by what Congress did in enacting ERISA. ERISA provides a uniform regulatory and enforcement scheme for employee retirement income plans. Important to the question under consideration here is the law's provision that carves out a space for a state like Montana to ensure that plan providers and administrators doing business within the State do not act counter to the public-policy objectives articulated by the legislature. The Insurance Commissioner is charged with protecting those laws and policies. The precise contours of the vertical distribution of power between the federal and state sovereigns set the standard of measure in this case. In other words, when federal law provides a uniform regulatory and enforcement scheme while simultaneously and expressly recognizing a space within this scheme for state governments to "regulate insurance," the question becomes one of fit between the state Insurance Commissioner's action and the federal statutory scheme Congress has established.

## II.

Summary judgment is appropriate when there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment must first demonstrate the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, that support the party's beliefs and demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party makes this requisite showing, the burden then shifts to the party opposing summary judgment to set forth specific facts showing that there is a genuine issue for trial. *Canada v. Blain's Helicopters, Inc.,* 831

F.2d 920, 923 (9th Cir.1987). All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The parties agree there are no disputed issues of material fact. The issue presented is a question of law. ERISA preempts all state laws related to any employee benefit plan, except state laws which regulate insurance, banking, or securities. *Kentucky Ass'n of Health Plans, Inc. v. Miller,* 538 U.S. 329, 333, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003) (citing 29 U.S.C. § 1144(a), (b)(2)(A)). The legal question here is whether, under federal case law interpreting the scope of ERISA's Savings Clause, Morrison's disapproval of discretionary clauses "regulates insurance" and is thus saved from preemption.

### A.

While ERISA "contains an express preemption provision," its "savings clause then reclaims a substantial amount of ground[.]" *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 364, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002). ERISA's preemption and savings provisions are "antiphonal clauses." *Id.* The odd interplay between ERISA's preemptive force and its Savings Clause is a recognition of American federalism: "In trying to extrapolate congressional intent ... when congressional language seems simultaneously to preempt everything and hardly anything," this peculiar feature of ERISA has left the Court "no choice but to temper the assumption that the ordinary meaning ... accurately expresses the legislative purpose with the qualification that the historic police powers of the States were not [meant] to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.*

Both parties argue primarily from the most recent Supreme Court case address-ing the scope of ERISA's Savings Clause, *Kentucky Ass'n of Health Plans, Inc. v. Miller,* 538 U.S. 329, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003). In *Kentucky Ass'n,* the Supreme Court held that the "Any Willing Provider" ("AWP") provision of Kentucky's Health Care Reform Act was saved from ERISA preemption. 538 U.S. at 339, 123 S.Ct. 1471. The AWP provision required health insurers to avoid discriminating against any providers located within the geographic coverage area of the health benefit plan who were willing to meet the terms and conditions for participation established by the insurer. *Id.* The petitioners, an association of health plans, argued that ERISA preempted the AWP law, and so the state insurance commissioner's enforcement of the law was unconstitutional. *Id.* at 332–33, 123 S.Ct. 1471. In a unanimous opinion, the Supreme Court held that Kentucky's AWP laws were saved from ERISA preemption because they regulated insurance. *Id.* at 342, 123 S.Ct. 1471.

In reaching its conclusion, the Court clarified what constitutes a law that regulates insurance. In doing so, it articulated a two-part test. *Id.* First, the state law must be specifically directed toward entities engaged in insurance. *Id.* Second, the state law must substantially affect the risk pooling arrangement between the insurer and the insured. *Id.* The Supreme Court found that Kentucky's AWP law was specifically directed toward entities engaged in insurance and substantially affected the risk pooling arrangement between the insurer and the insured by substantially expanding the number of providers from whom an insured may receive health services. The consequence altered the scope of permissible bargains between insurers and insureds. *Id.* at 338–39, 123 S.Ct. 1471. The rule announced in *Kentucky Ass'n* is based on the reasoning of three cases in which the Court evaluated wheth-

er a state law regulated insurance and was therefore saved from ERISA preemption.

First, the Court cited its holding in *Rush Prudential.* That case examined an Illinois law that provided recipients of health coverage by HMO's with a right to independent medical review of certain denials of benefits. *Kentucky Ass'n,* 538 U.S. at 335, 123 S.Ct. 1471 (citing 536 U.S. at 359, 122 S.Ct. 2151). The Court held that the law regulated insurance and was thus saved from preemption. The rule from *Rush Prudential* that the *Kentucky Ass'n* Court cited was: under ERISA's Savings Clause a state law that "regulates insurance" must regulate insurers "with respect to their insurance practices." *Id.* at 334, 123 S.Ct. 1471 (citing 536 U.S. at 366, 122 S.Ct. 2151).

Second, the Court looked to *UNUM Life Ins. Co. of America v. Ward,* a case that affirmed the Ninth Circuit's reversal of a district court's grant of summary judgment to an insurance company. 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999). The carrier denied benefits to a claimant who applied for them outside the time limits the insurance policy imposed. *Kentucky Ass'n,* 538 U.S. at 333, 123 S.Ct. 1471 (citing 526 U.S. at 363–64, 119 S.Ct. 1380). The Supreme Court affirmed the Ninth Circuit's holding that California's notice-prejudice rule, under which an insurer could not avoid liability where a claim was untimely unless the insurer showed it was prejudiced by the delay, was a state law that "regulates insurance" and was therefore saved from preemption.

*See UNUM,* 526 U.S. at 373, 119 S.Ct. 1380.

Third, the Court relied on *Metropolitan Life Ins. Co. v. Massachusetts,* which held that a state law mandating specified minimum mental-health insurance benefits regulated insurance. *Kentucky Ass'n,* 538 U.S. at 333, 123 S.Ct. 1471 (citing 471 U.S. 724, 727, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)). The *Metropolitan Life* Court observed that "[m]andated-benefit statutes . . . are only one variety of a matrix of state laws that regulate the substantive content of health insurance policies to further state health policy." *Id.* at 731, 105 S.Ct. 2380. The state law at issue reflected the state legislature's belief "that the public interest required that it correct the insurance market in the Commonwealth by mandating minimum-coverage levels, effectively forcing the good-risk individuals to become part of the risk pool[.]" *Id.*

Deducing from these three cases the principle against which the question of whether a state law "regulates insurance" is evaluated, the Court in *Kentucky Ass'n* noted that the AWP law under scrutiny "alter[ed] the scope of permissible bargains between insurers and insureds in a manner similar to the mandated benefit laws we upheld in *Metropolitan Life,* the notice-prejudice rule we sustained in *UNUM,* and the independent-review provisions we approved in *Rush Prudential.* . . . The AWP prohibition substantially affects the type of risk pooling arrangements that insurers may offer." 538 U.S. at 339, 123 S.Ct. 1471. The Court rejected its prior use of the so-called *McCarran–Ferguson* factors, making a "clean break" from them and announcing in their place the two-part *Kentucky Ass'n* test.[2]

**2.** At oral argument, in response to questions the Court posed drawing on the reasoning of *Rush Prudential,* counsel for Standard offered arguments for the Court to consider if it still believed *Rush Prudential* was good law after *Kentucky Ass'n.* This view of *Kentucky Ass'n* is contrary to the case's reasoning. *Kentucky Ass'n* did not overrule the reasoning of the cases within which it found the legal princi-

ples governing the issue of ERISA preemption. Rather, it expressly incorporated the principles that the Court's reasoning in these cases applied, and then presented the two-part rule as a means of applying these principles in future cases. In short, Defense counsel reads *Kentucky Ass'n* too narrowly, i.e., as establishing a "new rule," rather than as

## B.

### 1.

Standard argues that Morrison's action violates the Supremacy Clause because "ERISA permits discretionary clauses." This argument misses the mark. While the proposition is true, it skirts the issue. The question is not whether ERISA *permits* the clauses Morrison has disapproved, but whether ERISA *preempts* Morrison's action. The foundation of Morrison's claim is that his decision is a proper exercise of his state-statutory obligation and it is saved from preemption under federal law interpreting ERISA's Savings Clause. Because ERISA expressly saves from preemption state laws that "regulate insurance," the narrow question before the Court is whether Morrison's disapproval of discretionary clauses "regulates insurance" within the meaning of federal law interpreting ERISA. Whether or not ERISA permits discretionary clauses is of no moment here.

Counsel for Standard suggested at oral argument that because there are cases in which federal courts have evaluated challenges to plan-administrator actions under the abuse-of-discretion standard of review, plan carriers and administrators have something like a "right" to rely on the rules that federal courts have developed in this context. The argument seems to be that absent some express federal-law prohibition on discretionary clauses, plan carriers and administrators are entitled to rely on the use of discretionary clauses and their corresponding deferential standard of review. This argument puts the cart before the horse and it begs the question before the Court. There is no law granting Standard a right to a particular standard of review. The absence of federal law settling the question of whether an action like Morrison's is preempted is not conclusive that it is. While the Supreme Court has developed rules governing standards of review in ERISA cases, the existence of these rules and the insurance industry's reliance on them does not mean Morrison's disapproval of discretionary clauses does not "regulate insurance."

### 2.

With painstaking detail Standard exposes Morrison's personal dislike for discretionary clauses. According to Standard, Morrison has publicly stated that he believes discretionary clauses, because of the deferential standard of review they impose, result in unjust outcomes for claimants who have been denied benefits. Standard then argues that Morrison's decision to disapprove discretionary clauses is nothing less than an "attempt to wrest control of federal litigation." It argues Morrison's action is not "specifically directed toward entities engaged in insurance" as the *Kentucky Ass'n* test's first prong requires, but rather his decision of disallowance is directed toward the courts. Morrison's real motive, Standard insists, is to dictate for the courts the standard of review in ERISA cases.

Morrison's personal feelings about discretionary clauses (or about the insurance industry generally) have no bearing on the legal question before the Court. Whatever Morrison's subjective intent is, the question is whether his disapproving discretionary clauses "regulates insurance" and is therefore saved from preemption. While it is true that Morrison's action can affect the standard of review in cases where an ERISA challenge reaches the federal courts, it does not follow that his action does not "regulate insurance."

identifying and incorporating extant principles (which in turn cleared up confusion created by the *McCarran–Ferguson* factors) and then articulating a refined means of applying them.

Congress left the development of the details of ERISA law to the courts. *See Firestone*, 489 U.S. at 110, 109 S.Ct. 948 ("[C]ourts are to develop a 'federal common law of rights and obligations under ERISA-regulated plans.'") (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, at 56, 107 S.Ct. 1549, 95 L.Ed.2d 39; quoting *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 24, n. 26, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)) ("'[A] body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans'") (quoting 129 Cong.Rec. 29942 (1974) (remarks of Sen. Javits)). The relationship between an ERISA plan's discretionary clause and the standard of review on appeal is a consequence of this feature of ERISA law. Standard's argument collapses the distinction between this *consequence* of Morrison's action and the *object* of the exercise of what he claims is his statutory duty. The disadvantageous consequence for Standard of Morrison's exercise of judgment and power in disapproving discretionary clauses—a less friendly standard of review—does not answer the question of whether his action is "specifically directed toward entities engaged in insurance" and "substantially affects the risk-pooling arrangement between the insurer and the insured." Instead, the Court must look to the principles of the "federal common law of rights and obligations under ERISA-regulated plans" as expressed in the cases upon which the reasoning of *Kentucky Ass'n* rests and which its two-part test applies.

In *Rush Prudential*, the Court pointed to features and consequences of the state law under scrutiny that are strikingly similar to those associated with Morrison's disapproval of discretionary clauses. Writing for the majority in *Rush Prudential*, Justice Souter set forth reasons that apply neatly to the case here.

In deciding what to make of these facts and conclusions, it helps to go back to where we started and recall the ways States regulate insurance in looking out for the welfare of their citizens. ... While the [challenged] statute ... undeniably eliminates whatever may have remained of a plan sponsor's option to minimize scrutiny of benefit denials, this effect of eliminating an insurer's autonomy to guarantee terms congenial to its own interests is the stuff of garden variety insurance regulation through the imposition of standard policy terms. ... It is therefore hard to imagine a reservation of state power to regulate insurance that would not be meant to cover restrictions of the insurer's advantage in this kind of way. ... To the extent that benefit litigation in some federal courts may have to account for the effects of [the statute], it would be an exaggeration to hold that the objectives of [ERISA's savings clause] are undermined.

536 U.S. at 387, 122 S.Ct. 2151. Like the statute at issue in *Rush Prudential*, Morrison's action "eliminates ... a plan sponsor's option to minimize scrutiny of benefit denials," and "eliminat[es] an insurer's autonomy to guarantee terms congenial to its own interests[.]" *Id.* While Standard argues that Morrison's real motive is to affect the standard of review applied in federal court, this argument is easily framed in the opposite direction. The other side of the coin of this proposition shows that Standard wants the same thing: a deferential standard of review because this protects its interests, i.e., it lessens the chance that a plan-administrator's determination—that an insured should not be compensated for the costs of a realized risk—will be reversed. Morrison has, in essence, taken this advantage away from insurance companies operating in the state of Montana. "It is ... hard to imagine a

reservation of state power to regulate insurance that would not be meant to cover restrictions of the insurer's advantage in this kind of way." *Id.*

The *Rush Prudential* Court made clear that a state law's interference with an insurance company's preferred standard of review did not take the law beyond the scope of ERISA's Savings Clause. While the state law at issue in *Rush Prudential* interposed an additional stage of independent review, the Court's reasoning applies here. The Court explained that ERISA

simply requires plans to afford a beneficiary some mechanism for internal review of a benefit denial, and provides a right to a subsequent judicial forum for a claim to recover benefits. Whatever the standards for reviewing benefit denials may be, they cannot conflict with anything in the text of [ERISA], which we have read to require a uniform judicial regime of categories of relief and standards of primary conduct, *not a uniformly lenient regime of reviewing benefit determinations.*

536 U.S. at 385, 122 S.Ct. 2151 (citing *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)) (emphasis added). Directly on point here, the *Rush Prudential* Court added, in a footnote, "Nor is there any conflict in the removal of fiduciary 'discretion'; . . . ERISA does not require that such decisions be discretionary, and insurance regulation is not preempted merely because it conflicts with substantive plan terms." *Id.* n. 16 (citing *UNUM,* 526 U.S. at 376, 119 S.Ct. 1380).

At oral argument, Standard urged the Court to follow Standard's interpretation of *Rush Prudential*'s footnote 17, in which the Court stated, "We do not mean to imply that States are free to create other forms of binding arbitration to provide de novo review of any terms of insurance contracts . . . ." *Id.* at 386 n. 17, 122 S.Ct.

2151. Standard argued that if states are not "free to create other forms of binding arbitration to provide *de novo* review of any terms of insurance contracts[,]" Morrison, acting for Montana, must likewise be prohibited from taking any action that has as a consequence the loss of a deferential standard of review.

The remainder of footnote 17, however, refutes this argument, which is based upon the first half of the footnote's first sentence. The entire footnote reads:

We do not mean to imply that States are free to create other forms of binding arbitration to provide de novo review of any terms of insurance contracts; as discussed above, our decision rests in part on our recognition that the disuniformity Congress hoped to avoid is not implicated by decisions that are so heavily imbued with expert medical judgments. Rather, we hold that the feature of § 4–10 that provides a different standard of review with respect to mixed eligibility decisions from what would be available in court is not enough to create a conflict that undermines congressional policy in favor of uniformity of remedies.

*Id.* In this part of *Rush Prudential*'s reasoning, the Supreme Court recognized that the state law under scrutiny provided for independent review of a "fiduciary's [i.e., plan administrator's] medical judgment." *Id.* at 384, 122 S.Ct. 2151. The state law thus regulated HMO's with respect to the heart of health insurance claims—medical determinations. Footnote 17 recognized that a state's regulation of health insurance in this way implicated the very purpose of ERISA's Savings Clause, which makes room for a state to regulate. The state's interest in the business of health insurance to ensure that health insurance providers doing business within the state act in accordance with the state's health-

policy objectives provides a meaningful analogy here.

█ It is also worth noting that the passage to which the footnote corresponds addressed an argument the HMO in *Rush Prudential* raised, claiming that the state law interfered with ERISA's enforcement scheme by providing a state-law remedy. The Court rejected this contention, noting that the state law establishing an independent level of review

> prohibits designing an insurance contract so as to accord unfettered discretion to the insurer to interpret the contract's terms. As such, it does not implicate ERISA's enforcement scheme at all, and is no different from the types of substantive state regulation of insurance contracts we have in the past permitted to survive preemption, such as mandated-benefit statutes and statutes prohibiting the denial of claims solely on the ground of untimeliness.

*Id.* at 386, 122 S.Ct. 2151 (citing *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *UNUM Life Ins. Co. of America v. Ward,* 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999)). Footnote 17 does not bolster Standard's argument that Morrison's action is preempted. Morrison's action does not create a state-law remedy and the mere fact that it compromises Standard's preferred standard of review does not mean ERISA preempts it.

### 3.

Standard's main argument focuses on the meaning of "risk pooling" as used in the second prong of the *Kentucky Ass'n* test. The crux of the argument is that the term "risk pooling" has a narrow meaning specific to the insurance industry, and this is also its legal meaning as used in *Kentucky Ass'n.* Standard claims that "risk pooling" refers to "the principle that risk averse individuals will often prefer to take

a small but certain loss in preference to a large uncertain one." Thus, insurance systems "pool economic risk, resulting in a small loss to many [in the form of insurance premiums] rather than a large loss to the unfortunate few." To do this, insurance companies use a system of "risk classification, [which is a] set of specific rules by which individuals with certain risk characteristics are combined into risk pools."

From this industry understanding of the concept of risk pooling, Standard makes a simple argument. The argument asserts that because the moment the operation of a discretionary clause matters (when a claim is denied) comes *after* the pool of insureds has been established through risk classification, discretionary clauses cannot "substantially affect the risk pooling arrangement between the insurer and the insured." In other words, at the moment a discretionary clause matters, the risk pool is already established, so a discretionary clause cannot affect the risk pooling arrangement, and therefore the second prong of the *Kentucky Ass'n* test cannot be satisfied.

█ The argument, or a variation of it, was addressed in *Kentucky Ass'n.* To fall within the scope of ERISA's Savings Clause, a state law does not have to actually spread a policy holder's risk. "Our test only requires," the Supreme Court said, "that the state law substantially *affect* the risk pooling arrangement between the insurer and insured; *it does not require that the state law actually spread risk.*" 538 U.S. at 339 n. 3, 123 S.Ct. 1471 (emphasis added). The Court noted that the notice-prejudice rule at issue in *UNUM* "govern[ed] whether or not an insurance company must cover claims submitted late, which *dictates to the insurance company the conditions under which it must pay for the risk it has assumed.* This certainly qualifies as a substantial effect on the risk

pooling arrangement between the insurer and the insured." *Id.* (emphasis added). The concept applies here, too. Like the notice-prejudice rule at issue in *UNUM*, Morrison's disapproval of discretionary clauses "dictates to the insurance company the conditions under which it must pay for the risk it has assumed."

The fallacy of the argument made is that Standard urges the Court to apply the *language* of the second prong of the Supreme Court's *Kentucky Ass'n* test, but to ignore the reasoning to which the Court looked in developing it. Standard argues that the Court should understand the second prong of the test not in terms of what the case law that generated it shows it means, but in terms of how risk pooling is narrowly defined by the insurance industry. While this may be shrewd legerdemain, it is faulty legal analysis. The failure of this argument is obvious in light of the observation that the question before the Court involves the principle of federalism. The crux of the argument cannot be answered without considering what are the contours of the space Congress carved out for states to "regulate insurance" within the ERISA regulatory and enforcement scheme. To accept Standard's argument would be to read Supreme Court precedent as saying that ERISA's Savings Clause reflects Congress's intent to leave the regulation of the insurance industry to the insurance industry. While privatization may be an appealing policy in many areas, it is insufficient to alter the notion of federalism recognized by the Congress in defining the role of states in regulating insurance companies under ERISA plans.

If Standard is correct on this point, then the precedent to which the Supreme Court looked in developing the *Kentucky Ass'n* test to discover the principles explaining the interplay between ERISA's preemptive force and its Savings Clause has, in the end, nothing to do with federalism,

despite what this precedent says. This would mean that when the Supreme Court referred to the "risk pooling arrangement between the insurer and insured," it cast aside the opinion's reasoning—and the reasoning of *Rush Prudential*, *UNUM*, and *Metropolitan Life*—on which the Supreme Court expressly based the rule. The consequence would be that the Court intended lower courts to interpret "risk pooling" as an insurance industry actuary would. This scenario is unlikely, so, the Court is reluctant to accept Standard's argument.

The reasoning in *Kentucky Ass'n* compels the conclusion that the concept of "risk pooling" as used in the second prong of the articulated test is qualitatively different than Standard suggests. Standard argues that "risk" only means, literally, the type of risk insured against, e.g., the risk of physical injury or property loss. It then argues, the "pooling" of this risk refers narrowly to the insurance-industry practice of risk classification. Yet, the AWP provisions at issue in *Kentucky Ass'n*, the independent review requirement at issue in *Rush Prudential*, the notice-prejudice rule at issue in *UNUM*, and the mandatory benefits at issue in *Metropolitan Life*, each affected the substantive terms of the insurance policies under scrutiny in these cases, and not simply the risk insured against. Standard's interpretation ignores the reasoning of these cases that are the building blocks for the *Kentucky Ass'n* test.

■ Applying the Supreme Court's analysis of risk pooling as discussed in *Kentucky Ass'n*, Morrison's disapproval of discretionary clauses pursuant to Mont. Code Ann. § 33–1–502 qualifies as substantially affecting the risk pooling arrangement between the insurer and the insured. Like the provisions saved from ERISA preemption in the other cases, Morrison's action addresses the substan-

tive terms of insurance forms. It is directed at entities engaged in insurance. It alters the scope of permissible bargains between insurers and insureds. It eliminates Standard's option to minimize scrutiny of benefit denials, and eliminates Standard's autonomy to guarantee terms congenial to its own interests. As the Supreme Court noted in *Rush Prudential,* "this is the stuff of garden variety insurance regulation through the imposition of standard policy terms." 536 U.S. at 387, 122 S.Ct. 2151. Applying the reasoning of *Kentucky Ass'n,* Morrison's action meets the test. Disapproving ERISA plans containing discretionary clauses is directed at entities engaged in insurance, and it substantially affects the risk pooling arrangement between the insurer and the insured.

### 4.

Standard argues that Morrison's action violates the Supremacy Clause because it disrupts ERISA's civil enforcement scheme. At oral argument, Standard argued at some length from *Aetna Health, Inc. v. Davila,* 542 U.S. 200, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004), to support this proposition. Notably, *Davila* analyzed the meaning of 29 U.S.C. § 502(a)(1)(B), which creates federal jurisdiction for claims challenging a denial of benefits under an ERISA regulated plan. *See id.* at 210, 124 S.Ct. 2488. *Davila* originated in state court in Texas, where a state law—the Texas Health Care Liability Act ("THCLA")—allowed litigants to sue their HMOs for negligence in handling claims. Plaintiffs brought suits against AETNA, pursuant to THCLA in state court. Aetna removed the cases to federal district courts. Plaintiffs moved to remand, and the district courts denied the motions. The Fifth Circuit reversed, holding that the state causes of action did not "duplicate or fal[l] within the scope of an ERISA § 502 remedy" and therefore were not completely preempted. The Supreme

Court reversed the Fifth Circuit, holding that "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Id.* at 209, 124 S.Ct. 2488.

*Davila* did not address whether a state law regulated insurance within the meaning of ERISA's Savings Clause. The question in *Davila* was whether a litigant could challenge a denial of ERISA benefits under a state law that created a cause of action for this purpose. The Court determined that the preemptive force of ERISA's remedial provisions precluded such a state claim. A state law purporting to create a cause of action for challenging a denial of benefits under an ERISA plan is preempted by § 502. Standard argues that the preemptive force of § 502 is so strong, it takes Morrison's disapproval of discretionary clauses outside the scope ERISA's Savings Clause, found at § 1144. This argument conflates the purpose of § 502 with that of § 1144.

The interplay between ERISA's preemptive force pursuant to § 1144, which addresses state laws "relating to insurance," and its Savings Clause, is an acknowledgment of American federalism. The § 502 analysis in *Davila* addresses the Act's preemptive force in terms of *remedies.* These are distinct and different areas of the law of ERISA. Standard wants this Court to import into the Savings Clause analysis ERISA's preemptive force in the civil remedies context, and declare that Morrison's action falls outside the scope of the Savings Clause. Nowhere in its briefing, nor during oral argument, has Standard articulated the nexus between ERISA's civil enforcement scheme (i.e., § 502's preemptive purpose) and its

Savings Clause (i.e., § 1144's preemptive purpose).

As the foregoing discussion of *Rush Prudential*'s footnote 17 makes clear, the preemptive force of ERISA's remedial scheme and its saving from preemption state laws that regulate insurance are two distinct features of the law. Even more clearly than the state law at issue in *Rush Prudential,* Morrison's disapproval of discretionary clauses "does not implicate ERISA's enforcement scheme at all, and is no different from the types of substantive state regulation of insurance contracts [the Supreme Court has] in the past permitted to survive preemption." *Rush Prudential,* 536 U.S. at 386, 122 S.Ct. 2151. Standard's argument from *Davila* is unpersuasive.[3]

### III.

When it enacted ERISA, Congress provided for a uniform regulatory and enforcement scheme for employee retirement benefit plans. In doing so, it included the Savings Clause, which recognized the traditional role of states in regulating insurance on behalf of state citizens and in accordance with state public-policy objectives. The State Insurance Commissioner, in this role, has removed an advantage to ERISA plan providers and administrators doing business in Montana. This is the straight forward regulation of insurance, a matter ERISA expressly saves from preemption.

For the reasons set forth above,

IT IS HEREBY ORDERED that Plaintiff Standard Insurance Company's Motion for Summary Judgment (dkt # 38) is DENIED. Defendant John Morrison's Mo-

tion for Summary Judgment (dkt # 42) is GRANTED.

The Clerk is directed to enter judgment by a separate document in favor of the Defendant in accordance with this Opinion and Order.

---

**3.** Standard's argument from the Ninth Circuit case of *Security Life Ins. Co. v. Meyling,* 146 F.3d 1184 (9th Cir.1998) (en banc) is equally unavailing. There, the Ninth Circuit found a state law allowing rescission of an insurance contract pre-empted, but did so through applying the *McCarran–Ferguson* factors, from which *Kentucky Ass'n* expressly made a "clean break."